UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAM SHAMIE REVOCABLE TRUST By
SAM SHAMIE, TRUSTEE,

      Plaintiff,

-vs-

JONATHAN MEDVED and
OURCROWD INTERNATIONAL
GENERAL PARTNER, LP,
a Cayman Islands limited partnership.

      Defendants.

Civil Action No. _____

Honorable _____

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

## DEFENDANT MEDVED'S NOTICE OF REMOVAL

NOW COMES Defendant Jonathon Medved (***"Medved"***) by and through his counsel, Ishbia & Gagleard, P.C., and submits this Notice of Removal under 28 U.S.C. §§ 1332, 1441, and 1446 to remove the above-entitled action from the Oakland County Circuit Court, Michigan, which is pending under the cause number 2025-217633-CB (the State Court Action), to the United States District Court for the Eastern District of Michigan, Southern Division. In support of this Notice of Removal, Defendant Medved states as follows:

### I.  Introduction

1. On September 16, 2025, Sam Shamie Revocable Trust By Sam Shamie, Trustee ("***Shamie***" or ***"Plaintiff"***), filed its Complaint against the Defendants in the Oakland County Circuit Court ("***Complaint***").

2. On October 9, 2025 Shamie filed and Amended Complaint against the Defendants in the Oakland County Circuit Court (***"Amended Complaint"***).

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

3.    The Amended Complaint identified the corporate Defendant as OurCrowd International General Partner, LP, rather than as OC International General Partner, LP, as it was identified in the Complaint.

4.    On September 25, 2025, service of a Summons and Complaint on Defendant Medved was made, with a copy of the Summons and Complaint attached as **Exhibit 1**.

5.    Defendant Medved is timely filing this Notice of Removal within 30 days of service upon him in accordance with 28 U.S.C. §1446(b).

6.    The State Court Action alleges, in its Count I, a cause of action of *Recission* with the Plaintiff requesting that a $2,000,000 personal loan made by Shamie to Medved be rescinded, and that the parties be returned to the pre-contract status quo. See Amended Complaint, ¶¶70-75.

7.    The State Court Action alleges, in its Count II, the cause of action of *Fraud In The Inducement*. Allegations are made that Defendant Medved made a number of fraudulent misrepresentations of material fact, related to the $2,000,000.00 personal loan made by Shamie to Medved, which induced Shamie to make the loan. See Amended Complaint, ¶¶76-80.

8.    The State Court Action alleges, in its Count III, the cause of action of *Fraud.* The allegations are made that Medved made a number of fraudulent misrepresentations in the loan documents, related to the $2,000,000.00 personal loan made by Shamie to Medved. See Amended Complaint, ¶¶81-94.

9.    The State Court Action alleges, in its Count IV, the cause of action of *Breach of Contract* related to an alleged failure to make a $40,000 interest payment. See Amended Complaint, ¶¶95-103.

10.  The State Court Action alleges, in its Count V, the cause of action of *Breach of Implied Covenant of Good Faith and Fair Dealing* relating to the negotiations between Defendant

Medved and Plaintiff Shamie, only, regarding the $2,000,000 personal loan. See Amended Complaint, ¶¶104-112.

11. The State Court Action alleges, in its Count V, the cause of action of *Unjust Enrichment* relating to the $2,000,000 personal loan Plaintiff Shamie made to Defendant Medved. See Amended Complaint, ¶¶113-118.

**II.** **The Court Has Subject Matter Jurisdiction Over This Action Under 28 USC § 1332**

1. Under 28 U.S.C. § 1332, this Court has original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between the citizens of different states. Those jurisdictional prerequisites are met here.

**A.** **Complete diversity of citizenship exists.**

2. There is complete diversity between the parties.

3. Shamie is a duly created trust existing under the laws of the State of Michigan, See Amended Complaint, ¶8, that is represented by its trustee, Sam Shamie, who is a resident of the city of Bloomfield Hills, county of Oakland, state of Michigan. Therefore, Shamie is a citizen of Michigan. See 28 U.S.C. § 1332(c)(1).

4. Defendant Medved resides in the city of Jerusalem, country of Israel, and is a citizen of the country of Israel. Defendant Medved, therefore, is a citizen of the country of Israel. See 28 U.S.C. § 1332(c)(1).

5. Defendant OurCrowd International General Partner, LP, is a Limited Partnership established in the country of the Cayman Islands, with its principle place of business located in Jerusalem, Israel. Therefore, OurCrowd International General Partner, LP is a citizen of the country of the Cayman Islands. See 28 U.S.C. § 1332(c)(1).

6. Accordingly, this action involves "citizens of different states," 28 U.S.C. § 1332(a)(1)-(2) and meets the requirement of complete diversity of citizenship among the parties.

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

3

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

**B.     The amount in controversy exceeds $75,000.**

7.   Shamie alleges that it was damaged in the principal amount of at least, $2,000,000.00. See Amended Complaint, Prayer for Relief, ¶A. Accordingly, the amount-in-controversy requirement for diversity jurisdiction is satisfied because "the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs." 28 U.S.C. § 1332(a).

**III.     Removal Is Timely**

8.   This Notice of Removal is timely because it has been filed within 30 days after Defendant Medved's receipt of the Complaint on September 25, 2025. 28 U.S.C. § 1446(b)(1).

**IV.     Procedural Requirements for Removal Are Satisfied**

9.   Attached to this Notice, as **Exhibit 2,** are copies of all process, pleadings, and orders, if any, served on the Defendants in the State Court Action, in addition to the Amended Complaint which is included in **Exhibit 1**.

10.   This is the proper Court for the removal of this case because the United States District Court for the Eastern District of Michigan, Southern Division is the federal judicial district encompassing the Oakland County Circuit Court in the State of Michigan. See 28 U.S.C. § 102(a)(1).

11.   This notice will be served on Shamie, through its counsel of record, and will be filed promptly with the Oakland County Circuit Court. See 28 U.S.C. § 1446(d).

**V.     Conclusion**

12. For these reasons, this Court has diversity jurisdiction over this case under 28 U.S.C. § 1332 and removal is proper under 28 U.S.C. § 1446(b).

**VI.     Jury Demand**

13.     While Plaintiff Shamie has made a Jury Demand with its Complaint, Defendant Medved objects to the same as under the terms of the Convertible Promissory Note between

4

Plaintiff Shamie and Defendant Medved the parties, in Paragraph 12.6, waived the right to a trial by jury in the event of any dispute relating to the Convertible Promissory Note, or any transactions contemplated.

WHEREFORE, Defendant Medved removes this action from the Oakland County Circuit Court of Michigan to the United States District Court for the Eastern District of Michigan, under 28 U.S.C. §§ 1332, 1441, and 1446.

Respectfully submitted,

ISHBIA & GAGLEARD, P.C.

/s/ *Philip Cwagenberg*
Philip Cwagenberg (P36246)
Michael A. Root (P85104)
Attorney for Defendant Medved
251 E. Merrill St., Suite 212
Birmingham, MI 48009
(248) 647-8590
pc@iglawfirm.com
Dated: October 16, 2025            mroot@iglawfirm.com

f:\medved\shamie\pleadings\notice of removal\notice of removal 2025-10-16.docx

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

**EXHIBIT 1**

**AMENDED COMPLAINT**

1. Amended Complaint date 10/09/2025

ISHBIA & GAGLEARD, P.C.
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**SAM SHAMIE REVOCABLE TRUST**
**By SAM SHAMIE, TRUSTEE,**

<div style="margin-left:2em">Plaintiff,</div>

Case No. 25-217633-CB
Hon. Michael Warren

v

**JONATHAN MEDVED and**
**OURCROWD INTERNATIONAL**
**GENERAL PARTNER, LP, a Cayman**
**Islands limited partnership.**

<div style="margin-left:2em">Defendants.</div>

_____/

TAFT, STETTINIUS & HOLLISTER, LLP
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

_____/

## FIRST AMENDED COMPLAINT  jury pd/jj

**There is no other pending or resolved civil action between these**
**parties arising out of the same transaction or occurrence as**
**alleged in the complaint.**
**\*\*BUSINESS COURT ELIGIBLE\*\***

**Pursuant to MCR 2.112(O), this Case is eligible for assignment**
**to the specialized business court docket as (1) one or more of**
**the parties are business enterprises; and (2) arises out of a**
**commercial transaction.**

10/9/2025 11:35 AM   Oakland County Clerk   Received for Filing   FILED

1

Plaintiff, Sam Shamie Revocable Trust u/t/a dated March 16, 1978, as amended and restated ("Shamie Trust"), through Sam Shamie as trustee, by its counsel, Taft Stettinius & Hollister LLP, for its First Amended Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.     This action arises from Defendant Jonathan Medved's ("Medved") fraudulent scheme to induce Sam Shamie ("Shamie"), as trustee of the Shamie Trust, into providing a $2 million personal loan to Medved.

2.     Medved, Chief Executive Officer and co-founder of the Israeli venture capital firm OurCrowd, falsely represented that a direct investment in an OurCrowd-affiliated partnership, OurCrowd International General Partner, LP ("GP"), was not possible, and that providing a loan—secured by a pledge of Medved's units in GP—would be equivalent to, or better than, a direct investment and permitted under the relevant agreements.

3.     Medved further misrepresented that the loan would either be: (A) repaid with interest or (B) converted into an equity interest in GP upon the closing of a promised sale that would close within two to four years of the funding date of the loan that would double Shamie's equity investment.

4.     After Shamie funded the loan in reliance on Medved's representations, both parties mutually agreed to change the repayment schedule from annual to semiannual payments.

5.     Shamie later lost confidence in Medved's ability to repay, as Medved repeatedly avoided Shamie's requests to disclose the identities of GP's limited partners. Shamie expressly informed Medved that he did not want the loan converted into equity and expected full repayment with interest by year-end.

6.      When Shamie demanded full repayment of the loan and rejected any conversion to equity, Medved responded by orchestrating an equity financing round for GP that substantially reduced the value of Medved's pledged GP units, and then purportedly converted Shamie's loan into these now devalued units, resulting in significant losses to the Shamie Trust.

7.      The Shamie Trust now seeks rescission, or in the alternative, damages for fraud, breach of contract and the implied covenant of good faith and fair dealing, and unjust enrichment.

## PARTIES, JURISDICTION, AND VENUE

8.      Plaintiff, the Shamie Trust, is a duly created trust existing under the laws of the State of Michigan that is represented by its trustee, Sam Shamie.

9.      Defendant Medved resides in Jerusalem, Israel, and is the President and co-founder of OurCrowd, an Israeli venture capital firm.

10.     Defendant GP is a Cayman Islands limited partnership.

11.     Jurisdiction is proper in this Court because the amount in controversy exceeds $25,000, exclusive of interest, costs and attorneys' fees. Medved agreed to submit to the jurisdiction of the courts in Oakland County, Michigan, and GP's contacts with this jurisdiction arise from the same agreement.

12.     Venue is proper in this Court because the cause of action arises from a contract that contains a forum-selection provision, and thus all or part of the cause of action arose in this county.

## FACTUAL ALLEGATIONS

13.     OurCrowd manages investments in privately held, emerging technology companies through a network of affiliated limited partnerships ("OurCrowd LPs").

14.     The Shamie Trust is an investor in the OurCrowd LPs.

3

15.     Medved controls the OurCrowd LPs through OurCrowd General Partner Limited ("GPGP"), a Cayman Islands company, which serves as the general partner of Defendant OurCrowd International General Partner ("GP"), a Cayman Islands limited partnership.

16.     GP serves as the general partner for the OurCrowd LPs.

**Medved's False Representations and Fraudulent Inducement of the Loan Agreement**

17.     In August 2022, Medved and Shamie had a call, during which Medved represented to Shamie that GP would be sold within two to four years. Medved also represented that GP was financially strong and would not seek financing from investors unless they invested or loaned at least $50,000,000. These representations were false when made—Medved neither intended to sell GP within the promised timeframe nor restrict new financing to $50,000,000 or more. In fact, GP has not been sold and later raised capital from new investors in amounts significantly less than $50,000,000.

18.     Intrigued and already an investor in the OurCrowd LPs, Shamie inquired about making a direct investment in GP. In seeking to invest, Shamie reasonably relied on Medved's statements regarding the sale of GP and the assurance that GP's units would not be diluted or encumbered by new financing below the $50,000,000 threshold.

19.     However, Medved refused to permit Shamie to make a direct investment in GP, explaining that GP's governing documents prevented him from transferring GP units without the consent of the partnership.

20.     Instead, Medved proposed that Shamie participate in the anticipated sale by providing a $2 million, five-year loan to Medved personally (the "Loan"), which would bear 4% compounded interest, be secured by a pledge of Medved's GP units, and be convertible by Shamie—at a discounted rate—into a direct ownership interest in GP upon its sale.

4

21.     Medved represented that, unlike a direct investment in GP, the Loan structure was permissible under GP's governing documents. Shamie relied on these representations to move forward with the Loan.

22.     Medved's stated justification for preferring the Loan over a direct investment was false when made. In reality, GP's limited partnership agreement also required partnership consent to pledge units.

23.     When Shamie requested a list identifying GP's limited partners to understand who else had invested in GP and so that he could contact them regarding capital calls and distributions, Medved stated he would provide the information at a later date. Despite repeated requests, Medved never provided the information and offered no transparency to that end. Medved disregarded Shamie's requests in order to perpetuate the misrepresentations he had made regarding his ability to unilaterally pledge GP units.

24.     Medved further reiterated that the proposed Loan was superior to equity in GP, emphasizing that the Loan would be convertible into a GP ownership interest upon sale, would generate interest income for the Shamie Trust in the interim, and would be secured by Medved's pledged GP units.

25.     Throughout the summer of 2022, Medved repeatedly represented that GP would be sold within two to four years and that Shamie would at least double his investment as a result. He further assured Shamie that if GP was not sold during the term of the Loan, Shamie would be repaid the principal together with interest. These representations were false when made and were purposefully made to induce Shamie to enter into the Loan Agreements and to forbear from pursuing collection of the Loan.

26.     Shamie, acting on behalf of the Shamie Trust, reasonably and justifiably relied upon Medved's false representations of material fact made during the summer of 2022, in deciding to enter into the Loan agreements with Medved and later agree to restructure interest payments on the Loan.

27.     As a direct and proximate result of Shamie's reasonable reliance on Medved's intentional misrepresentations, the Shamie Trust sustained significant financial damages.

## The Loan Agreements

28.     On October 19, 2022, the Shamie Trust extended the Loan pursuant to a convertible promissory note ("Note Agreement") and a pledge agreement ("Pledge Agreement," and together, the "Loan Agreements").

29.     Shamie executed the Loan Agreements as trustee of the Shamie Trust.

30.     Medved executed the Loan Agreements in his personal capacity.

31.     The Shamie Trust and Medved are the parties to the Loan Agreements ("Loan Parties").

32.     Medved is in possession of the Loan Agreements.

### The Note Agreement

33.     Under the Note Agreement, the Shamie Trust agreed to fund the Loan in two installments: $300,000 on execution of the Note Agreement and the remaining $1.7 million on December 20, 2022.

34.     Medved unconditionally promised to repay the Shamie Trust the $2,000,000 principal plus interest.

35.     The Loan carries an annual interest rate of 4%, compounded quarterly, with interest payments due on December 20th of each year during the five-year term.

36.    The Note Agreement provides that the Loan matures on the earlier of (a) December 20, 2025, or (b) any earlier due date resulting from a default.

37.    An event of default occurs if: (i) Medved fails to pay principal or interest when due and does not cure within ten days after written notice from Shamie; (ii) any representation or warranty by Medved in the Loan Agreements is false when made; or (iii) Medved fails to perform a covenant under the Loan Agreements.

38.    Upon default, the interest rate increases to 9% per annum.

39.    Importantly, the Note Agreement set forth the manner in which the Loan could be converted into not less than 666,667 units of GP. Conversion could occur under any of the following circumstances:

- Medved could elect to convert the Loan into GP units at any time;

- The Shamie Trust could convert the Loan after an event of default or upon Medved's death;

- The Shamie Trust could convert the Loan upon the closing of the next equity financing valued at $50,000,000 or more;

- The Shamie Trust could convert the Loan upon the sale of GP.

40.    The conversion price was determined by the circumstances triggering conversion.

41.    Relevant here, if Medved elected to convert, the price was set at $3 per unit of GP. If the Shamie Trust converted upon the closing of an equity financing of $50,000,000 or more, the conversion price per unit would be the lesser of: (a) 80 percent of the lowest per unit purchase price of the equity securities issued in that financing, or (b) $3 per unit of GP.

42.    The Note Agreement also contains various representations, warranties, and covenants.

43.     Medved represented and warranted that, to the best of his knowledge, the Loan Agreements would not violate any governing documents or contracts by which he was bound, including GP's limited partnership agreement.

44.     Medved further represented and warranted that the conversion units—consisting of not less than 666,667 units of GP to be issued to the Shamie Trust upon conversion—were not subject to, nor in violation of, any preemptive or similar rights of any person.

45.     Additionally, Medved covenanted to materially comply with all obligations under his contracts and agreements with GP.

46.     The Note Agreement contains a full recourse provision ("Full Recourse Provision") that applies in the event of fraud, damage to or loss of any part of the pledged units, or Medved's gross negligence or willful misconduct, making Medved personally liable for payment of the Loan and performance of all obligations under the Loan Agreements.

47.     The Full Recourse Provision applies because: (a) Medved made fraudulent representations inside and outside the Loan Agreements; (b) the March Equity Financing (defined below) damaged the GP units pledged by Medved; and (c) Medved's willful misconduct in violating the spirit of the Loan Agreements—converting the Loan after the Loan Parties mutually agreed to restructure payments and after the March Equity Financing substantially reduced the value of the GP units.

*The Pledge Agreement*

48.     Under the Pledge Agreement, Medved pledged no fewer than 666,667 GP units as collateral for the Loan, granting the Shamie Trust a first-priority lien and security interest in those units. This security interest was to remain in effect until all obligations under the Note Agreement were fully satisfied.

49.     Medved represented and warranted that, to the best of his knowledge, the transactions contemplated by the Loan Agreements—including his pledge of GP units—would not violate GP's limited partnership agreement, and that he possessed the full power, authority, capacity, and legal right to pledge such units pursuant to the Pledge Agreement.

50.     Medved further represented and warranted that the pledge created a valid and perfected first-priority security interest in the pledged units, thereby securing prompt payment and fulfillment of his obligations under the Note Agreement.

51.     The pledged GP units were intended to secure Medved's due and timely payment of principal and interest, along with the performance of all covenants, duties, debts, and other obligations arising under the Note Agreement.

### Medved's Fraudulent Representations in the Loan Agreements

52.     As previously described (¶¶16–26), Medved fraudulently induced the Shamie Trust to enter the Loan Agreements by making false statements regarding his authority and ability to pledge and issue GP units; these same falsehoods were subsequently set forth as representations and warranties within the Loan Agreements.

53.     Medved represented and warranted in the Loan Agreements that he held the legal right to pledge his GP units and that doing so would not violate GP's limited partnership agreement; however, these statements were materially untrue at the time they were made. In fact, GP's limited partnership agreement contains both a right of first refusal and a right of co-sale, which specifically restrict a partner's ability to transfer, or pledge, GP units without requisite partnership approval.

54.     Although the Loan Agreements acknowledged Medved's obligation to comply with these transfer restrictions, he failed to obtain necessary consents before execution, rendering his

pledge invalid from the outset. As a result, during the life of the Loan, the units that Medved purported to pledge were never valid collateral, and his representations and warranties were false when made. Consequently, the Shamie Trust suffered damages as a direct result of relying on these false statements and the absence of valid collateral.

### Medved Breached the Loan Agreements

55.     In addition to making false representations of material fact both in and outside the Loan Agreements, Medved breached his covenant to repay the Shamie Trust the $2,000,000 principal plus interest.

56.     On November 1, 2023, Shamie, on behalf of the Shamie Trust, sent Medved the first invoice on the Loan, requesting an $82,000 interest payment due on December 20, 2023 ("First Invoice").

57.     Around the same time, the Loan Parties mutually agreed to change the cadence of interest payments from annual to semiannual, effective beginning in 2024.

58.     Medved paid the First Invoice on time.

59.     Subsequently, Shamie sent Medved a $40,000 interest invoice due June 20, 2024 ("Second Invoice") and a $40,000 interest invoice due December 20, 2024 ("Third Invoice").

60.     Medved paid the Second and Third Invoices by their due dates.

61.     As discussed below, on June 2, 2025, Shamie sent Medved a $40,000 interest invoice due June 20, 2025 ("Fourth Invoice"). Medved has not paid the Fourth Invoice.

62.     On July 30, 2025, Shamie issued a written demand ("Notice of Default") for payment of the Fourth Invoice. Because Medved failed to pay following the Notice of Default, the outstanding loan principal and Fourth Invoice began bearing interest at a rate of 9% per annum from the date of non-payment.

### Medved Breached the Implied Covenant of Good Faith and Fair Dealing

63.     Shamie informed Medved during a call in March 2025 that he wanted repayment of the principal and interest owed no later than December 31, 2025—whether by paying off the loan or finding another investor to assume Shamie's position as lender—and that he did not want the Loan converted into GP units. Shamie expressed concerns regarding Medved's ability to repay and cited a lack of confidence due to Medved's continued failure to provide a list of GP's limited partners despite repeated requests. In response, Medved stated that he would attempt to facilitate Shamie's exit from the position.

64.     Thereafter, despite previously representing that GP would not conduct any financing for less than $50,000,000, in March 2025, Medved orchestrated an equity financing for GP that raised less than $15,000,000 at a price of $0.75 per GP unit ("March Equity Financing").

65.     The March Equity Financing valued GP's units at $0.75, a price substantially lower than the $3 per GP unit conversion price available to Medved under the Note Agreement.

66.     On June 2, 2025, Shamie sent Medved the Fourth Invoice.

67.     Medved did not pay the Fourth Invoice when due. Instead, on June 8, 2025, Medved sent a Notice of Conversion under the Note Agreement ("Notice of Conversion"), purporting to convert the Loan's $2,000,000 principal balance and $40,000 interest balance into 680,000 GP units at $3 per unit.

68.     Because the March Equity Financing raised less than $50,000,000, the conversion price was not set at 80 percent of the lowest per unit purchase price of the equity securities issued in that financing. Had this threshold been met, the Shamie Trust could have converted the Loan and interest at $0.60 per unit rather than $3.00 per unit—resulting in the issuance of approximately 3,333,400 GP units to the Shamie Trust.

69.     Medved took advantage of the Shamie Trust by converting the Loan to GP units after the Shamie Trust had restructured the interest payments, and after Medved conducted the March Equity Financing, which was never contemplated when the parties entered into the Loan Agreements and severely reduced the value of the pledged units. This conduct breached the implied covenant of good faith and fair dealing in the Loan Agreements, causing substantial harm to the Shamie Trust.

## COUNT I – RESCISSION
### (Equitable Relief)

70.     The Shamie Trust incorporates the preceding paragraphs as if fully set forth herein.

71.     The Loan Parties entered into two valid and binding agreements, the Loan Agreements, on October 19, 2022.

72.     The Shamie Trust seeks to rescind the Loan Agreements, promises to return to Medved what the Shamie Trust received in the bargain, and to restore the parties, as nearly as possible, to their pre-contract status quo.

73.     The Notice of Conversion is void *ab initio*; therefore, it never had any legal effect. The principal and interest of the Loan were not converted, and the Shamie Trust is not, and never was, a limited partner of GP.

74.     An independent cause of action supporting rescission exists because: (i) Medved made fraudulent representations both in and outside the Loan Agreements, entitling the Shamie Trust to rescind those contracts; (ii) Medved materially breached essential provisions of the Loan Agreements; (iii) Medved engaged in deceitful conduct toward the Shamie Trust—including agreeing to restructure interest payments, then conducting the March Equity Financing not contemplated by the parties, and converting the Loan into devalued GP units; and (iv) no adequate remedy at law exists.

75.     The Shamie Trust is entitled to consequential damages to be determine at trial for losses directly resulting from Medved's fraudulent misrepresentations to the extent necessary to restore the Shamie Trust to the pre-contract status quo.

## COUNT II – FRAUD IN THE INDUCEMENT
### (In the Alternative)

76.     The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

77.     During the summer of 2022, Medved made numerous fraudulent representations of material fact to induce Shamie, on behalf of the Shamie Trust, to enter into the Loan Agreements, including the following:

- GP would be sold within two to four years, and Shamie would double his investment as a result;

- Unlike offering GP units directly, securing the Loan with pledged GP units was permissible under GP's governing documents;

- GP was financially strong and would not seek any new financing less than $50,000,000;

- Medved would provide Shamie with a list identifying GP's limited partners;

- The Loan was superior to equity in GP because it would be convertible into GP ownership interest upon GP's sale, would generate interest income for the Shamie Trust in the interim, and would be secured by Medved's GP units;

- If GP was not sold during the term of the Loan, Shamie would be repaid the principal together with interest.

78.     Medved knew these material misrepresentations were false when made, or he made such representations recklessly, without knowledge of their truth, as a positive assertion.

79.     Medved made these material misrepresentations with the intention that Shamie, on behalf of the Shamie Trust, would rely upon them and enter into the Loan Agreements.

80.     The Shamie Trust acted in reliance upon these material misrepresentations when entering into the Loan Agreements, and suffered damages as a result.

### COUNT III – FRAUD
### (In the Alternative)

81.     The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

82.     Medved made several fraudulent representations in the Loan Agreements, including by making false representations regarding his ability to pledge GP units.

83.     Specifically, Medved's representations and warranties in the Loan Agreements— that he had the legal right to pledge his GP units and that the pledge of his GP units did not violate GP's limited partnership agreement—were untrue when made.

84.     When Medved made these false representations and warranties in the Loan Agreements, he knew they were false or made them recklessly, without knowledge of their truth, as a positive assertion.

85.     GP's limited partnership agreement contains a right of first refusal and right of co-sale, which expressly limit a partner's ability to transfer, including pledge, their GP units without securing the necessary approvals.

86.     Medved never obtained the required approvals to pledge the GP units before entering into the Loan Agreements, despite the pledge being an essential term that should have been satisfied upon execution.

87.     Medved made these false representations of material fact with the intention that Sam, on behalf of the Shamie Trust, would rely and act upon them.

88.    The Shamie Trust did, in fact, act in reliance upon the representations and warranties in the Loan Agreements.

89.    As a result, the Shamie Trust made a Loan to Medved without any valid collateral and suffered harm as a consequence.

90.    In addition, both before entering into the Loan Agreements and within the Note Agreement itself, Medved expressly represented to the Shamie Trust that he would repay the principal balance on the Loan with interest.

91.    Medved knowingly made these material misrepresentations with the purpose and intent that Sam, acting on behalf of the Shamie Trust, would rely on them and refrain from seeking collection of the Loan.

92.    The Shamie Trust, in reasonable reliance on Medved's misrepresentations, agreed in 2023 to restructure the interest payments from annual to semi-annual beginning in 2024.

93.    When Shamie informed Medved in March 2025 that he wanted repayment of the principal and interest owed no later than December 31, 2025—whether by paying off the loan or finding another investor to assume Shamie's position as lender—and that he did not want the Loan converted into GP units, Medved stated that he would attempt to facilitate Shamie's exit from the position. Shamie, on behalf of the Shamie Trust, reasonably relied on this misrepresentation.

94.    As a direct result of its reliance, the Shamie Trust did not collect on the Loan prior to Medved orchestrating the March Equity Financing and purporting to convert the Loan into diminished GP units, and the Shamie Trust suffered damages.

## COUNT IV – BREACH OF CONTRACT
### (In the Alternative)

95.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

96.     The Loan Parties entered into two valid and binding agreements—the Loan Agreements—on October 19, 2022.

97.     Under the Note Agreement, Medved promised to repay the Shamie Trust the $2,000,000 Loan principal plus interest.

98.     After the Loan Parties restructured the interest payments, Medved failed to pay the Fourth Invoice, which was due on June 20, 2025.

99.     Medved did not pay the Fourth Invoice even after Shamie issued a Notice of Default. As of the date of this Complaint, the Fourth Invoice—a $40,000 interest payment due on June 20, 2025—remains unpaid.

100.    Because Medved breached his covenant to pay, as well as his representations and warranties in the Loan Agreements, he is in default.

101.    The Notice of Conversion is void *ab initio* and without legal effect.

102.    The Shamie Trust has suffered damages as a result of Medved's material breaches.

103.    Medved personally owes the Shamie Trust the loan principal amount of $2,000,000 plus interest, which, since the date of non-payment, is subject to a default interest rate of 9% per annum.

### COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (In the Alternative)

104.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

105.    In drafting the Loan Agreements, the Loan Parties agreed that Medved would have a fixed conversion price of $3.00 per GP unit, and that the Shamie Trust would have a formula-based conversion right if GP conducted an equity financing valued at least $50,000,000.

106.    This agreement reflected the parties' prior discussions, in which Medved represented that GP was financially strong and would not seek any financing of less than $50,000,000. These representations and understandings were integral to the Loan Agreements and to the Shamie Trust accepting Medved's fixed $3.00 per unit conversion right.

107.    Contrary to these understandings, in March 2025, Medved orchestrated the March Equity Financing, an equity financing significantly below the agreed-upon threshold, which raised less than $15,000,000 at a price of $0.75 per GP unit.

108.    The $0.75 per unit price in the March Equity Financing was substantially lower than the $3.00 per unit conversion price provided to Medved under the Loan Agreements, frustrating the parties' agreed expectations.

109.    Shortly thereafter, and in an apparent effort to avoid paying the Shamie Trust's Fourth Invoice, Medved sent a Notice of Conversion purporting to convert the Loan's $2,000,000 principal balance and $40,000 interest balance into 680,000 GP units at $3.00 per unit.

110.    Because the March Equity Financing raised less than $50,000,000, the Shamie Trust was precluded from exercising its bargained-for right to convert its Loan at 80 percent of the lowest per-unit purchase price of securities sold in that financing. Had the threshold been met, the Shamie Trust would have converted at $0.60 per unit and received approximately 3,333,400 GP units, rather than only 680,000.

111.    Medved's orchestration of the March Equity Financing and subsequent Notice of Conversion—particularly after securing restructuring of interest payments—deprived the Shamie Trust of the fruits of its bargain, undermined its reasonable expectations under the Loan Agreements, and destroyed the value of the pledged units.

112.    Medved's conduct, as described above, constitutes a breach of the implied covenant of good faith and fair dealing inherent in the Loan Agreements, and has caused substantial harm to the Shamie Trust.

## COUNT VI – UNJUST ENRICHMENT
### (In the Alternative)

113.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

114.    The Loan Parties entered into two valid and binding agreements—the Loan Agreements—on October 19, 2022.

115.    However, there is no express or enforceable contract between the Shamie Trust and Medved that governs the specific conduct and circumstances at issue in this dispute.

116.    Specifically, the Loan Agreements did not contemplate that Medved would arrange for an equity financing in an amount less than $50,000,000, thereby significantly reducing the value of Medved's pledged GP units to $0.75 per unit, and then claim the right to convert the Loan into GP units at a conversion price of $3.00 per unit.

117.    The Shamie Trust conferred a direct benefit on Medved in the form of a $2,000,000 personal loan plus interest, which Medved has failed and refused to repay.

118.    Under these circumstances, Medved's retention of the Loan principal and interest is inequitable, and it would be unjust for Medved to retain this benefit without full compensation to the Shamie Trust.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Shamie Trust respectfully requests that this Court enter judgment in its favor and grant the following relief against Defendant:

18

A.    Granting equitable relief to Plaintiff rescinding the Loan Agreements and requiring the parties to take necessary steps to restore their pre-contract status quo, including by ordering Medved to pay to the Shamie Trust $2,000,000 USD, the principal of the Loan, together with additional consequential damages sustained by the Shamie Trust as a direct result of Medved's fraudulent conduct, net of any payments made by Medved to the Shamie Trust, the precise amount of which shall be determined at trial, plus costs, interest and attorneys' fees; and ordering GP, to the extent necessary, to correct its books and records to reflect that Plaintiff is not, and never was, a limited partner of GP;

B.    Alternatively, awarding monetary damages in an amount not less than $2,040,000 USD, comprising the principal balance of the Loan and all interest, as of June 20, 2025, together with all interest owed from that date at a rate of 9% per annum and additional consequential damages sustained by the Plaintiff as a result of Medved's fraudulent conduct, the precise amount of which shall be determined at trial, plus costs, interest and reasonable attorneys' fees; and

C.    Such other and further relief in Plaintiff's favor as the Court deems just and proper.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

/s/ Henry W. Longley
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

Dated: October 9, 2025

19

**STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND
BUSINESS COURT**

**SAM SHAMIE REVOCABLE TRUST
By SAM SHAMIE, TRUSTEE,**

                          Plaintiff,                       Case No. 25-217633-CB
                                                      Hon. Michael Warren

v

**JONATHAN MEDVED and
OURCROWD INTERNATIONAL
GENERAL PARTNER, LP, a Cayman
Islands limited partnership.**

                          Defendants.

_____/

TAFT, STETTINIUS & HOLLISTER, LLP
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

_____/

## JURY DEMAND

      Plaintiff hereby demands a trial by jury on all issues and claims so triable.

                             Respectfully submitted,

                             TAFT STETTINIUS & HOLLISTER LLP

                             */s/ Henry W. Longley*
                             Michael F. Jacobson (P47059)
                             Michelle C. Harrell (P48768)
                             Henry W. Longley (P88318)
                             Attorneys for Plaintiff
                             27777 Franklin Road, Suite 2500

20

Southfield, MI 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

Dated: October 9, 2025

21

**EXHIBIT 2**

**Copies of All Process, Pleadings, and Orders Served
on the Defendants in The State Court Action**

1.   Summons and Complaint dated 9/16/2025

**ISHBIA & GAGLEARD, P.C.**
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**SAM SHAMIE REVOCABLE TRUST**
**By SAM SHAMIE, TRUSTEE,**

2025-217633-CB

JUDGE MICHAEL WARREN

          Plaintiff,

v

**JONATHAN MEDVED and**
**OC INTERNATIONAL GENERAL**
**PARTNER, LP, a Cayman Islands**
**limited partnership**.

          Defendants.

Case No. 25-          -CB
Hon.

_____/

TAFT, STETTINIUS & HOLLISTER, LLP
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com
_____/

## COMPLAINT

**There is no other pending or resolved civil action between these**
**parties arising out of the same transaction or occurrence as**
**alleged in the complaint.**
**\*\*BUSINESS COURT ELIGIBLE\*\***

**Pursuant to MCR 2.112(O), this Case is eligible for assignment**
**to the specialized business court docket as (1) one or more of**
**the parties are business enterprises; and (2) arises out of a**
**commercial transaction.**

1

Plaintiff, Sam Shamie Revocable Trust u/t/a dated March 16, 1978, as amended and restated ("Shamie Trust"), through Sam Shamie as trustee, by its counsel, Taft Stettinius & Hollister LLP, for its Complaint against Defendants, alleges as follows:

## INTRODUCTION

1.      This action arises from Defendant Jonathan Medved's ("Medved") fraudulent scheme to induce Sam Shamie ("Shamie"), as trustee of the Shamie Trust, into providing a $2 million personal loan to Medved.

2.      Medved, Chief Executive Officer and co-founder of the Israeli venture capital firm OurCrowd, falsely represented that a direct investment in an OurCrowd-affiliated partnership, OC International General Partner, LP ("GP"), was not possible, and that providing a loan—secured by a pledge of Medved's units in GP—would be equivalent to, or better than, a direct investment and permitted under the relevant agreements.

3.      Medved further misrepresented that the loan would either be: (A) repaid with interest or (B) converted into an equity interest in GP upon the closing of a promised sale that would close within two to four years of the funding date of the loan that would double Shamie's equity investment.

4.      After Shamie funded the loan in reliance on Medved's representations, both parties mutually agreed to change the repayment schedule from annual to semiannual payments.

5.      Shamie later lost confidence in Medved's ability to repay, as Medved repeatedly avoided Shamie's requests to disclose the identities of GP's limited partners. Shamie expressly informed Medved that he did not want the loan converted into equity and expected full repayment with interest by year-end.

2

6. When Shamie demanded full repayment of the loan and rejected any conversion to equity, Medved responded by orchestrating an equity financing round for GP that substantially reduced the value of Medved's pledged GP units, and then purportedly converted Shamie's loan into these now devalued units, resulting in significant losses to the Shamie Trust.

7. The Shamie Trust now seeks rescission, or in the alternative, damages for fraud, breach of contract and the implied covenant of good faith and fair dealing, and unjust enrichment.

## PARTIES, JURISDICTION, AND VENUE

8. Plaintiff, the Shamie Trust, is a duly created trust existing under the laws of the State of Michigan that is represented by its trustee, Sam Shamie.

9. Defendant Medved resides in Jerusalem, Israel, and is the President and co-founder of OurCrowd, an Israeli venture capital firm.

10. Defendant GP is a Cayman Islands limited partnership.

11. Jurisdiction is proper in this Court because the amount in controversy exceeds $25,000, exclusive of interest, costs and attorneys' fees. Medved agreed to submit to the jurisdiction of the courts in Oakland County, Michigan, and GP's contacts with this jurisdiction arise from the same agreement.

12. Venue is proper in this Court because the cause of action arises from a contract that contains a forum-selection provision, and thus all or part of the cause of action arose in this county.

## FACTUAL ALLEGATIONS

13. OurCrowd manages investments in privately held, emerging technology companies through a network of affiliated limited partnerships ("OurCrowd LPs").

14. The Shamie Trust is an investor in the OurCrowd LPs.

3

15.     Medved controls the OurCrowd LPs through OurCrowd General Partner Limited ("GPGP"), a Cayman Islands company, which serves as the general partner of OC International GP ("GP"), a Cayman Islands limited partnership.

16.     GP serves as the general partner for the OurCrowd LPs.

**Medved's False Representations and Fraudulent Inducement of the Loan Agreement**

17.     In August 2022, Medved and Shamie had a call, during which Medved represented to Shamie that GP would be sold within two to four years. Medved also represented that GP was financially strong and would not seek financing from investors unless they invested or loaned at least $50,000,000. These representations were false when made—Medved neither intended to sell GP within the promised timeframe nor restrict new financing to $50,000,000 or more. In fact, GP has not been sold and later raised capital from new investors in amounts significantly less than $50,000,000.

18.     Intrigued and already an investor in the OurCrowd LPs, Shamie inquired about making a direct investment in GP. In seeking to invest, Shamie reasonably relied on Medved's statements regarding the sale of GP and the assurance that GP's units would not be diluted or encumbered by new financing below the $50,000,000 threshold.

19.     However, Medved refused to permit Shamie to make a direct investment in GP, explaining that GP's governing documents prevented him from transferring GP units without the consent of the partnership.

20.     Instead, Medved proposed that Shamie participate in the anticipated sale by providing a $2 million, five-year loan to Medved personally (the "Loan"), which would bear 4% compounded interest, be secured by a pledge of Medved's GP units, and be convertible by Shamie—at a discounted rate—into a direct ownership interest in GP upon its sale.

4

21.     Medved represented that, unlike a direct investment in GP, the Loan structure was permissible under GP's governing documents. Shamie relied on these representations to move forward with the Loan.

22.     Medved's stated justification for preferring the Loan over a direct investment was false when made. In reality, GP's limited partnership agreement also required partnership consent to pledge units.

23.     When Shamie requested a list identifying GP's limited partners to understand who else had invested in GP and so that he could contact them regarding capital calls and distributions, Medved stated he would provide the information at a later date. Despite repeated requests, Medved never provided the information and offered no transparency to that end. Medved disregarded Shamie's requests in order to perpetuate the misrepresentations he had made regarding his ability to unilaterally pledge GP units.

24.     Medved further reiterated that the proposed Loan was superior to equity in GP, emphasizing that the Loan would be convertible into a GP ownership interest upon sale, would generate interest income for the Shamie Trust in the interim, and would be secured by Medved's pledged GP units.

25.     Throughout the summer of 2022, Medved repeatedly represented that GP would be sold within two to four years and that Shamie would at least double his investment as a result. He further assured Shamie that if GP was not sold during the term of the Loan, Shamie would be repaid the principal together with interest. These representations were false when made and were purposefully made to induce Shamie to enter into the Loan Agreements and to forbear from pursuing collection of the Loan.

5

26. Shamie, acting on behalf of the Shamie Trust, reasonably and justifiably relied upon Medved's false representations of material fact made during the summer of 2022, in deciding to enter into the Loan agreements with Medved and later agree to restructure interest payments on the Loan.

27. As a direct and proximate result of Shamie's reasonable reliance on Medved's intentional misrepresentations, the Shamie Trust sustained significant financial damages.

### The Loan Agreements

28. On October 19, 2022, the Shamie Trust extended the Loan pursuant to a convertible promissory note ("Note Agreement") and a pledge agreement ("Pledge Agreement," and together, the "Loan Agreements").

29. Shamie executed the Loan Agreements as trustee of the Shamie Trust.

30. Medved executed the Loan Agreements in his personal capacity.

31. The Shamie Trust and Medved are the parties to the Loan Agreements ("Loan Parties").

32. Medved is in possession of the Loan Agreements.

### *The Note Agreement*

33. Under the Note Agreement, the Shamie Trust agreed to fund the Loan in two installments: $300,000 on execution of the Note Agreement and the remaining $1.7 million on December 20, 2022.

34. Medved unconditionally promised to repay the Shamie Trust the $2,000,000 principal plus interest.

35. The Loan carries an annual interest rate of 4%, compounded quarterly, with interest payments due on December 20th of each year during the five-year term.

6

36.     The Note Agreement provides that the Loan matures on the earlier of (a) December 20, 2025, or (b) any earlier due date resulting from a default.

37.     An event of default occurs if: (i) Medved fails to pay principal or interest when due and does not cure within ten days after written notice from Shamie; (ii) any representation or warranty by Medved in the Loan Agreements is false when made; or (iii) Medved fails to perform a covenant under the Loan Agreements.

38.     Upon default, the interest rate increases to 9% per annum.

39.     Importantly, the Note Agreement set forth the manner in which the Loan could be converted into not less than 666,667 units of GP. Conversion could occur under any of the following circumstances:

- Medved could elect to convert the Loan into GP units at any time;

- The Shamie Trust could convert the Loan after an event of default or upon Medved's death;

- The Shamie Trust could convert the Loan upon the closing of the next equity financing valued at $50,000,000 or more;

- The Shamie Trust could convert the Loan upon the sale of GP.

40.     The conversion price was determined by the circumstances triggering conversion.

41.     Relevant here, if Medved elected to convert, the price was set at $3 per unit of GP. If the Shamie Trust converted upon the closing of an equity financing of $50,000,000 or more, the conversion price per unit would be the lesser of: (a) 80 percent of the lowest per unit purchase price of the equity securities issued in that financing, or (b) $3 per unit of GP.

42.     The Note Agreement also contains various representations, warranties, and covenants.

7

43.     Medved represented and warranted that, to the best of his knowledge, the Loan Agreements would not violate any governing documents or contracts by which he was bound, including GP's limited partnership agreement.

44.     Medved further represented and warranted that the conversion units—consisting of not less than 666,667 units of GP to be issued to the Shamie Trust upon conversion—were not subject to, nor in violation of, any preemptive or similar rights of any person.

45.     Additionally, Medved covenanted to materially comply with all obligations under his contracts and agreements with GP.

46.     The Note Agreement contains a full recourse provision ("Full Recourse Provision") that applies in the event of fraud, damage to or loss of any part of the pledged units, or Medved's gross negligence or willful misconduct, making Medved personally liable for payment of the Loan and performance of all obligations under the Loan Agreements.

47.     The Full Recourse Provision applies because: (a) Medved made fraudulent representations inside and outside the Loan Agreements; (b) the March Equity Financing (defined below) damaged the GP units pledged by Medved; and (c) Medved's willful misconduct in violating the spirit of the Loan Agreements—converting the Loan after the Loan Parties mutually agreed to restructure payments and after the March Equity Financing substantially reduced the value of the GP units.

### *The Pledge Agreement*

48.     Under the Pledge Agreement, Medved pledged no fewer than 666,667 GP units as collateral for the Loan, granting the Shamie Trust a first-priority lien and security interest in those units. This security interest was to remain in effect until all obligations under the Note Agreement were fully satisfied.

49. Medved represented and warranted that, to the best of his knowledge, the transactions contemplated by the Loan Agreements—including his pledge of GP units—would not violate GP's limited partnership agreement, and that he possessed the full power, authority, capacity, and legal right to pledge such units pursuant to the Pledge Agreement.

50. Medved further represented and warranted that the pledge created a valid and perfected first-priority security interest in the pledged units, thereby securing prompt payment and fulfillment of his obligations under the Note Agreement.

51. The pledged GP units were intended to secure Medved's due and timely payment of principal and interest, along with the performance of all covenants, duties, debts, and other obligations arising under the Note Agreement.

### Medved's Fraudulent Representations in the Loan Agreements

52. As previously described (¶¶16–26), Medved fraudulently induced the Shamie Trust to enter the Loan Agreements by making false statements regarding his authority and ability to pledge and issue GP units; these same falsehoods were subsequently set forth as representations and warranties within the Loan Agreements.

53. Medved represented and warranted in the Loan Agreements that he held the legal right to pledge his GP units and that doing so would not violate GP's limited partnership agreement; however, these statements were materially untrue at the time they were made. In fact, GP's limited partnership agreement contains both a right of first refusal and a right of co-sale, which specifically restrict a partner's ability to transfer, or pledge, GP units without requisite partnership approval.

54. Although the Loan Agreements acknowledged Medved's obligation to comply with these transfer restrictions, he failed to obtain necessary consents before execution, rendering his

9

pledge invalid from the outset. As a result, during the life of the Loan, the units that Medved purported to pledge were never valid collateral, and his representations and warranties were false when made. Consequently, the Shamie Trust suffered damages as a direct result of relying on these false statements and the absence of valid collateral.

<div align="center">**Medved Breached the Loan Agreements**</div>

55.    In addition to making false representations of material fact both in and outside the Loan Agreements, Medved breached his covenant to repay the Shamie Trust the $2,000,000 principal plus interest.

56.    On November 1, 2023, Shamie, on behalf of the Shamie Trust, sent Medved the first invoice on the Loan, requesting an $82,000 interest payment due on December 20, 2023 ("First Invoice").

57.    Around the same time, the Loan Parties mutually agreed to change the cadence of interest payments from annual to semiannual, effective beginning in 2024.

58.    Medved paid the First Invoice on time.

59.    Subsequently, Shamie sent Medved a $40,000 interest invoice due June 20, 2024 ("Second Invoice") and a $40,000 interest invoice due December 20, 2024 ("Third Invoice").

60.    Medved paid the Second and Third Invoices by their due dates.

61.    As discussed below, on June 2, 2025, Shamie sent Medved a $40,000 interest invoice due June 20, 2025 ("Fourth Invoice"). Medved has not paid the Fourth Invoice.

62.    On July 30, 2025, Shamie issued a written demand ("Notice of Default") for payment of the Fourth Invoice. Because Medved failed to pay following the Notice of Default, the outstanding loan principal and Fourth Invoice began bearing interest at a rate of 9% per annum from the date of non-payment.

## Medved Breached the Implied Covenant of Good Faith and Fair Dealing

63.     Shamie informed Medved during a call in March 2025 that he wanted repayment of the principal and interest owed no later than December 31, 2025—whether by paying off the loan or finding another investor to assume Shamie's position as lender—and that he did not want the Loan converted into GP units. Shamie expressed concerns regarding Medved's ability to repay and cited a lack of confidence due to Medved's continued failure to provide a list of GP's limited partners despite repeated requests. In response, Medved stated that he would attempt to facilitate Shamie's exit from the position.

64.     Thereafter, despite previously representing that GP would not conduct any financing for less than $50,000,000, in March 2025, Medved orchestrated an equity financing for GP that raised less than $15,000,000 at a price of $0.75 per GP unit ("March Equity Financing").

65.     The March Equity Financing valued GP's units at $0.75, a price substantially lower than the $3 per GP unit conversion price available to Medved under the Note Agreement.

66.     On June 2, 2025, Shamie sent Medved the Fourth Invoice.

67.     Medved did not pay the Fourth Invoice when due. Instead, on June 8, 2025, Medved sent a Notice of Conversion under the Note Agreement ("Notice of Conversion"), purporting to convert the Loan's $2,000,000 principal balance and $40,000 interest balance into 680,000 GP units at $3 per unit.

68.     Because the March Equity Financing raised less than $50,000,000, the conversion price was not set at 80 percent of the lowest per unit purchase price of the equity securities issued in that financing. Had this threshold been met, the Shamie Trust could have converted the Loan and interest at $0.60 per unit rather than $3.00 per unit—resulting in the issuance of approximately 3,333,400 GP units to the Shamie Trust.

11

69.     Medved took advantage of the Shamie Trust by converting the Loan to GP units after the Shamie Trust had restructured the interest payments, and after Medved conducted the March Equity Financing, which was never contemplated when the parties entered into the Loan Agreements and severely reduced the value of the pledged units. This conduct breached the implied covenant of good faith and fair dealing in the Loan Agreements, causing substantial harm to the Shamie Trust.

## COUNT I – RESCISSION
### (Equitable Relief)

70.     The Shamie Trust incorporates the preceding paragraphs as if fully set forth herein.

71.     The Loan Parties entered into two valid and binding agreements, the Loan Agreements, on October 19, 2022.

72.     The Shamie Trust seeks to rescind the Loan Agreements, promises to return to Medved what the Shamie Trust received in the bargain, and to restore the parties, as nearly as possible, to their pre-contract status quo.

73.     The Notice of Conversion is void *ab initio*; therefore, it never had any legal effect. The principal and interest of the Loan were not converted, and the Shamie Trust is not, and never was, a limited partner of GP.

74.     An independent cause of action supporting rescission exists because: (i) Medved made fraudulent representations both in and outside the Loan Agreements, entitling the Shamie Trust to rescind those contracts; (ii) Medved materially breached essential provisions of the Loan Agreements; (iii) Medved engaged in deceitful conduct toward the Shamie Trust—including agreeing to restructure interest payments, then conducting the March Equity Financing not contemplated by the parties, and converting the Loan into devalued GP units; and (iv) no adequate remedy at law exists.

12

75.     The Shamie Trust is entitled to consequential damages to be determine at trial for losses directly resulting from Medved's fraudulent misrepresentations to the extent necessary to restore the Shamie Trust to the pre-contract status quo.

## COUNT II – FRAUD IN THE INDUCEMENT
### (In the Alternative)

76.     The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

77.     During the summer of 2022, Medved made numerous fraudulent representations of material fact to induce Shamie, on behalf of the Shamie Trust, to enter into the Loan Agreements, including the following:

- GP would be sold within two to four years, and Shamie would double his investment as a result;

- Unlike offering GP units directly, securing the Loan with pledged GP units was permissible under GP's governing documents;

- GP was financially strong and would not seek any new financing less than $50,000,000;

- Medved would provide Shamie with a list identifying GP's limited partners;

- The Loan was superior to equity in GP because it would be convertible into GP ownership interest upon GP's sale, would generate interest income for the Shamie Trust in the interim, and would be secured by Medved's GP units;

- If GP was not sold during the term of the Loan, Shamie would be repaid the principal together with interest.

78.     Medved knew these material misrepresentations were false when made, or he made such representations recklessly, without knowledge of their truth, as a positive assertion.

13

79. Medved made these material misrepresentations with the intention that Shamie, on behalf of the Shamie Trust, would rely upon them and enter into the Loan Agreements.

80. The Shamie Trust acted in reliance upon these material misrepresentations when entering into the Loan Agreements, and suffered damages as a result.

## COUNT III – FRAUD
### (In the Alternative)

81. The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

82. Medved made several fraudulent representations in the Loan Agreements, including by making false representations regarding his ability to pledge GP units.

83. Specifically, Medved's representations and warranties in the Loan Agreements— that he had the legal right to pledge his GP units and that the pledge of his GP units did not violate GP's limited partnership agreement—were untrue when made.

84. When Medved made these false representations and warranties in the Loan Agreements, he knew they were false or made them recklessly, without knowledge of their truth, as a positive assertion.

85. GP's limited partnership agreement contains a right of first refusal and right of co-sale, which expressly limit a partner's ability to transfer, including pledge, their GP units without securing the necessary approvals.

86. Medved never obtained the required approvals to pledge the GP units before entering into the Loan Agreements, despite the pledge being an essential term that should have been satisfied upon execution.

87. Medved made these false representations of material fact with the intention that Sam, on behalf of the Shamie Trust, would rely and act upon them.

14

88.    The Shamie Trust did, in fact, act in reliance upon the representations and warranties in the Loan Agreements.

89.    As a result, the Shamie Trust made a Loan to Medved without any valid collateral and suffered harm as a consequence.

90.    In addition, both before entering into the Loan Agreements and within the Note Agreement itself, Medved expressly represented to the Shamie Trust that he would repay the principal balance on the Loan with interest.

91.    Medved knowingly made these material misrepresentations with the purpose and intent that Sam, acting on behalf of the Shamie Trust, would rely on them and refrain from seeking collection of the Loan.

92.    The Shamie Trust, in reasonable reliance on Medved's misrepresentations, agreed in 2023 to restructure the interest payments from annual to semi-annual beginning in 2024.

93.    When Shamie informed Medved in March 2025 that he wanted repayment of the principal and interest owed no later than December 31, 2025—whether by paying off the loan or finding another investor to assume Shamie's position as lender—and that he did not want the Loan converted into GP units, Medved stated that he would attempt to facilitate Shamie's exit from the position. Shamie, on behalf of the Shamie Trust, reasonably relied on this misrepresentation.

94.    As a direct result of its reliance, the Shamie Trust did not collect on the Loan prior to Medved orchestrating the March Equity Financing and purporting to convert the Loan into diminished GP units, and the Shamie Trust suffered damages.

**COUNT IV – BREACH OF CONTRACT**
**(In the Alternative)**

95.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

96.     The Loan Parties entered into two valid and binding agreements—the Loan Agreements—on October 19, 2022.

97.     Under the Note Agreement, Medved promised to repay the Shamie Trust the $2,000,000 Loan principal plus interest.

98.     After the Loan Parties restructured the interest payments, Medved failed to pay the Fourth Invoice, which was due on June 20, 2025.

99.     Medved did not pay the Fourth Invoice even after Shamie issued a Notice of Default. As of the date of this Complaint, the Fourth Invoice—a $40,000 interest payment due on June 20, 2025—remains unpaid.

100.    Because Medved breached his covenant to pay, as well as his representations and warranties in the Loan Agreements, he is in default.

101.    The Notice of Conversion is void *ab initio* and without legal effect.

102.    The Shamie Trust has suffered damages as a result of Medved's material breaches.

103.    Medved personally owes the Shamie Trust the loan principal amount of $2,000,000 plus interest, which, since the date of non-payment, is subject to a default interest rate of 9% per annum.

## COUNT V – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (In the Alternative)

104.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

105.    In drafting the Loan Agreements, the Loan Parties agreed that Medved would have a fixed conversion price of $3.00 per GP unit, and that the Shamie Trust would have a formula-based conversion right if GP conducted an equity financing valued at least $50,000,000.

106.    This agreement reflected the parties' prior discussions, in which Medved represented that GP was financially strong and would not seek any financing of less than $50,000,000. These representations and understandings were integral to the Loan Agreements and to the Shamie Trust accepting Medved's fixed $3.00 per unit conversion right.

107.    Contrary to these understandings, in March 2025, Medved orchestrated the March Equity Financing, an equity financing significantly below the agreed-upon threshold, which raised less than $15,000,000 at a price of $0.75 per GP unit.

108.    The $0.75 per unit price in the March Equity Financing was substantially lower than the $3.00 per unit conversion price provided to Medved under the Loan Agreements, frustrating the parties' agreed expectations.

109.    Shortly thereafter, and in an apparent effort to avoid paying the Shamie Trust's Fourth Invoice, Medved sent a Notice of Conversion purporting to convert the Loan's $2,000,000 principal balance and $40,000 interest balance into 680,000 GP units at $3.00 per unit.

110.    Because the March Equity Financing raised less than $50,000,000, the Shamie Trust was precluded from exercising its bargained-for right to convert its Loan at 80 percent of the lowest per-unit purchase price of securities sold in that financing. Had the threshold been met, the Shamie Trust would have converted at $0.60 per unit and received approximately 3,333,400 GP units, rather than only 680,000.

111.    Medved's orchestration of the March Equity Financing and subsequent Notice of Conversion—particularly after securing restructuring of interest payments—deprived the Shamie Trust of the fruits of its bargain, undermined its reasonable expectations under the Loan Agreements, and destroyed the value of the pledged units.

17

112.    Medved's conduct, as described above, constitutes a breach of the implied covenant of good faith and fair dealing inherent in the Loan Agreements, and has caused substantial harm to the Shamie Trust.

### COUNT VI – UNJUST ENRICHMENT
### (In the Alternative)

113.    The Shamie Trust incorporates by reference the preceding paragraphs as if fully set forth herein.

114.    The Loan Parties entered into two valid and binding agreements—the Loan Agreements—on October 19, 2022.

115.    However, there is no express or enforceable contract between the Shamie Trust and Medved that governs the specific conduct and circumstances at issue in this dispute.

116.    Specifically, the Loan Agreements did not contemplate that Medved would arrange for an equity financing in an amount less than $50,000,000, thereby significantly reducing the value of Medved's pledged GP units to $0.75 per unit, and then claim the right to convert the Loan into GP units at a conversion price of $3.00 per unit.

117.    The Shamie Trust conferred a direct benefit on Medved in the form of a $2,000,000 personal loan plus interest, which Medved has failed and refused to repay.

118.    Under these circumstances, Medved's retention of the Loan principal and interest is inequitable, and it would be unjust for Medved to retain this benefit without full compensation to the Shamie Trust.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Shamie Trust respectfully requests that this Court enter judgment in its favor and grant the following relief against Defendant:

A.   Granting equitable relief to Plaintiff rescinding the Loan Agreements and requiring the parties to take necessary steps to restore their pre-contract status quo, including by ordering Medved to pay to the Shamie Trust $2,000,000 USD, the principal of the Loan, together with additional consequential damages sustained by the Shamie Trust as a direct result of Medved's fraudulent conduct, net of any payments made by Medved to the Shamie Trust, the precise amount of which shall be determined at trial, plus costs, interest and attorneys' fees; and ordering GP, to the extent necessary, to correct its books and records to reflect that Plaintiff is not, and never was, a limited partner of GP;

B.   Alternatively, Awarding monetary damages in an amount not less than $2,040,000 USD, comprising the principal balance of the Loan and all interest, as of June 20, 2025, together with all interest owed from that date at a rate of 9% per annum and additional consequential damages sustained by the Plaintiff as a result of Medved's fraudulent conduct, the precise amount of which shall be determined at trial, plus costs, interest and reasonable attorneys' fees; and

C.   Such other and further relief in Plaintiff's favor as the Court deems just and proper.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

/s/ Michael F. Jacobson
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

Dated: September 16, 2025

19

**STATE OF MICHIGAN**
**IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND**
**BUSINESS COURT**

**SAM SHAMIE REVOCABLE TRUST**
**By SAM SHAMIE, TRUSTEE,**

2025-217633-CB

Plaintiff,

Case No. 25- -CB

Hon. JUDGE MICHAEL WARREN

v

**JONATHAN MEDVED and**
**OC INTERNATIONAL GENERAL**
**PARTNER, LP, a Cayman Islands**
**Limited partnership.**

Defendants.

_____/

TAFT, STETTINIUS & HOLLISTER, LLP
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, Michigan 48034
(248) 351-3000
MJacobson@taftlaw.com
MHarrell@taftlaw.com
HLongley@taftlaw.com

_____/

**JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues and claims so triable.

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

Dated: September 16, 2025

*/s/ Michael F. Jacobson*
Michael F. Jacobson (P47059)
Michelle C. Harrell (P48768)
Henry W. Longley (P88318)
Attorneys for Plaintiff
27777 Franklin Road, Suite 2500
Southfield, MI 48034
(248) 351-3000
MJacobson@taftlaw.com

**CERTIFICATE OF SERVICE**

On October 16, 2025, I electronically submitted these papers with the Clerk of Court for the U.S. District Court of Eastern District of Michigan, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Philip Cwagenberg*

**ISHBIA & GAGLEARD, P.C.**
Attorneys and Counselors
251 Merrill St., Suite 212
Birmingham, MI 48009